

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v.    ) | No. 18-cr-403 |
| ) | |
| THOMAS BARFIELD, et al.,   ) | Hon. Charles R. Norgle |
| ) | |
| Defendants.   ) | |

## ORDER

Defendant Barfield's motion to reconsider [251] is granted. Defendant Barfield's motion to suppress [238] is denied.

## MEMORANDUM OPINION

Defendant Thomas Barfield ("Defendant" or "Barfield") has moved to suppress his post-arrest statements made to law enforcement during a roughly five-hour interrogation on June 28, 2018. Barfield had been arrested earlier that day after a more than year-long federal narcotics investigation in Chicago's Austin neighborhood, which resulted in the present ten-defendant drug distribution and money laundering conspiracy case. The interrogation began at about 7:15 a.m., and about three-and-a-half hours of the questioning was audio recorded.[1]

Barfield makes two arguments for suppression, each of which draws directly from the audio recording of the interrogation, which the Court has reviewed. First, Barfield argues that roughly two-hours, 41-minutes into the interrogation he invoked his right to remain silent and,

---

[1] The second half of the interrogation was not recorded due to technological issues, according to the parties. The audio recording itself at times contains indiscernible statements, due to echo, individuals speaking over one another, and individuals making utterances that may originally have been incoherent. The Court has reviewed the original audio provided by Defendant and additionally has reviewed the transcript that the Government had produced by a court reporter (pursuant to the Court's August 16, 2019 Order). The Court finds that the transcript accurately records the sections of text quoted throughout this opinion, and thus for ease of all parties (and the Court) has cited to the transcript rather than the audio recording.

despite that invocation, officers continued to question him. The Government stated in response that it will not rely on any statements made after that alleged invocation, and thus this argument is moot for purposes of this motion and any statements made after the two-hour, 41-minute mark of the interrogation will not be entered into evidence. See Dkt. 269 at 2. Second, Barfield argues that the interrogating officers made a false promise that there was a "way out" of prosecution for Barfield and that this false promise, combined with psychological pressure related to the fate of his former intimate partner and co-defendant Quiera Walls, had the effect of rendering all of Barfield's statements coerced. As to this second argument, the Court disagrees, and for the following reasons Defendant's motion to suppress is denied.[2]

## I. BACKGROUND

The relevant facts are as follows. On June 27, 2018, the Government filed a complaint charging Defendant with conspiring with others to possess with intent to distribute more than a kilogram of heroin and a quantity of fentanyl from December 2017 to May 2018. On the morning on June 28, 2018, Defendant was arrested pursuant to a warrant. Following his arrest, at approximately 7:15 a.m., Barfield was taken in for questioning with Special Agents Hagee and Denwitz of the Department of Homeland Security. The agents asked whether Barfield had been arrested before and whether he understood his rights, to which he responded yes. Tr. 5:11-14.

---

[2] The Court initially denied Defendant's motion to suppress (Dkt. 238) in a July 10, 2019 Order on the basis that Defendant had not submitted a sufficient evidentiary basis from which the Court could address the merits of the argument (Dkt. 250). Defendant moved the Court to reconsider its ruling (Dkt. 251), specifically challenging the Court's parenthetical which suggested that Defendant is required to submit an affidavit for his motion to be considered. The Court clarified its July 10, 2019 Order with a subsequent July 25, 2019 Order stating that the motion to reconsider remained under advisement and that the Defendant could supplement the record with an evidentiary basis dealing with the un-recorded portions of the interrogation. On August 15, 2019, Defendant filed an affidavit and a police report dealing with that portion of the interrogation, and on August 16, 2019, the Court ordered briefing on Defendant's motion to reconsider (Dkt. 261). The Government subsequently filed a response to Defendant's motion to suppress (Dkt. 269), and Defendant filed a reply to the Government's response. The motion to suppress has thus been fully briefed. The motion to reconsider is thus granted and this opinion deals with the merits of the motion to suppress.

Agent Denwitz then read Barfield his rights and stated that if he understood his rights he should print and sign his name to a <u>Miranda</u> waiver form, which he did. Tr. 6:15-7:9. The agents began asking Barfield biographical questions, including his age (36), the number of children he had (seven), about his girlfriend (Alice), and what he did for a living (he had previously worked in waste management but had been out of work for a year). <u>See</u> Tr. 7-11.

The agents then transitioned to a discussion of what had been going on historically at the corners of S. Homan Ave. and W. Douglas Blvd, where agents had been investigating alleged narcotics trafficking. Tr. 16. The agents began showing Barfield photos of various individuals and asking him to identify them. Tr. 20-34. The tenor of the conversation shifted, however, when the agents played Barfield audio of a conversation that Barfield had had that law enforcement had recorded. Tr. 34:11. Agent Hagee then asked Barfield whether the investigation was bigger than Barfield had originally thought, to which Barfield expressed some surprise that earlier in the conversation Hagee had said that Barfield was normally a sharp dresser, from which Barfield said he inferred that he was being surveilled. Hagee then said the following:

> Mr. Hagee: . . . Here's the thing. There's – there may be a way out of this. Okay? I know you're not all the way at the top, but I know you're above Socks; right? You're in the middle. I know there's people above you; there's people below you; right?
>
> Mr. Barfield: [Inaudible]
>
> Mr. Hagee: Okay. So this is going to be – well, let's kind of hit the restart button on this. All right? There may be a way for you to sort of help yourself –
>
> Mr. Barfield: You got a lot of Mexicans up in there. I don't know no Mexicans.
>
> Mr. Hagee: We'll get to that. That's where you come in. That's where you might be able to help.

3

Tr. 35:12-36:2. Hagee then said he wanted to go through some of the same photographs he had already shown Barfield, and Barfield stated that he had already told the agents their names. Denwitz then said:

> Ms. Denwitz: . . . it takes time to start to build the relationship. So we – we're not, like, accusing you. We're not telling you, like, we're pissed that that happened that you – we expect that and we get it. And, like, we understand you don't us yet either. So that's why we're, like, here –
>
> Mr. Barfield: I didn't say I don't trust you all.
>
> Ms. Denwitz: But, I mean, that's how it is. I don't trust you right away. Like we're going to communicate and figure things out together. We understand why you're being a little vague. Now, we kind of put more cards on the table, and so we're going to give you an opportunity to work with us. That's your biggest opportunity. You know what I'm saying? So we're going to give you the opportunity to work with us, and we'll go over some of these photos and, you know . . .
>
> Mr. Barfield: Okay.

Tr. 36:2-37:14. Next, Barfield expressed concern that after the warrant had been executed that morning the house may have been left accessible to potential burglars, and the agents stated that the house would have been secured following the arrest. Tr. 39:16-17. After a brief back and forth, the agents played another audio recording for Barfield, this one from January 16, according to the agent. See Tr. 40-41. Barfield and the agents then began talking about heroin. Id. Almost immediately after talking about heroin, the following exchange occurred:

> Mr. Hagee: Okay. What's a pack of heroin?
>
> Mr. Barfield: They call it 13 packs. I mean, like I said, you all helping me [inaudible] can be used against me. [inaudible].

4

Mr. Hagee: It's both. Okay? So it's kind of a double-edged sword. You got to talk to us in order for us to help you.

Tr. 41:16-22. Shortly thereafter, Barfield and Hagee had the following exchange:

Mr. Barfield: This shit is fucked up man. It's really fucked up. [Inaudible] federal. Federal worse than any state.

Agent Hagee: Agreed. Yeah.

Mr. Barfield: You know what I'm saying? I mean, I'm -- I'm fucked.

Mr. Hagee: Which hopefully a little more incentive for you to work with us. . . .

Tr. 42:14-20. Barfield then began identifying certain individuals in response to the agents' questioning before faltering slightly, at which point the following exchange occurred:

Ms. Denwitz: You're doing good. You just – 'cause this is how this works. Like, how we know answers to questions and then when you are honest with us, then we can establish that rapport. And then we're like -- yeah, okay, he's being honest with us. Like, we go forward and we can ask you questions that

Mr. Barfield: Right. But then I don't want to be telling you [inaudible] that recording and then I get caught and they use it against me in court.

Ms. Denwitz: No. But it can be used to help you as well 'cause you're being –

Mr. Barfield: That sound [inaudible] these people work for me. [inaudible]. You know what I'm saying? That's -- like you just said [inaudible]. Whatever I say ya'll going to turn around and use it against me. [inaudible]. Back when I got caught with my gun, police say [inaudible]. You know what I'm saying? [inaudible]. It's my gun case.

Ms. Denwitz: It's a little bit different though 'cause we're --

Mr. Barfield: I know it, but they always [inaudible].

5

Ms. Denwitz: I know. We are not CPD. We're with the feds.

Mr. Barfield: I know. But I'm saying is, like [inaudible]. What I'm saying is like -- anything I say can be used against me in a court of law.

Mr. Hagee: It could be. It could be, yes. And with -- I know you mentioned -- or I heard you mention you got a gun case with CPD. I want to steer clear of -- you have two gun cases with CPD.

Mr. Barfield: Yeah.

Mr. Hagee: I want to steer clear of those. Okay? Because those cases are ongoing. You're represented on those cases. I can't talk to you about those cases.

Mr. Barfield: [inaudible].

Mr. Hagee: Okay. I just -- I stepped out. I wanted to make sure.

Mr. Barfield: [inaudible]. My lawyer say you shouldn't have fucking said this. Why you say this?

Mr. Hagee: Yeah.

Mr. Barfield: So if you all want me to work with you, don't hurt me. You know what I'm saying? Like don't hurt me. [inaudible]. Turn around in court and everything I tell you all is [inaudible]. So if you all want me to help ya'll [inaudible]. Don't hurt me to a point [inaudible]. This person's doing that, this person's doing that. [inaudible]. That's going to hurt me. [inaudible]. Ya'll investigating that block and saying that block is mine. You know what I'm saying? [inaudible] fish bigger than me.

Mr. Hagee: That's what I wanted to get to, because I don't know if the block is yours. What would happen right now if somebody tried to move in on that block and set up and sell dope there?
. . .

Tr. 45:22-48:5.

The conversation then turned back to the details about drug trade in the Austin neighborhood for a short while before Barfield again raised concerns that he was incriminating himself:

> Mr. Barfield: Just telling me to say yeah to -- once again incriminate myself, getting it all on tape.
>
> Mr. Hagee: Again, it's part of the process. In order for us to get to C, we got to stop at A and B. And C is where you're helping us out a little bit, moving up the chain, putting somebody else [inaudible].
>
> Mr. Barfield: [inaudible] telling me 'cause I'm already booked.
>
> Mr. Hagee: You're booked, yeah. I mean, you're in a tough spot, man. But it's one of those things where --
>
> Mr. Barfield: [inaudible] I'm in tough spot already [inaudible]. Which is it? [inaudible] You know everything, but now you want me to admit to it. You see what I'm saying? So that's like I'm incriminating myself. [inaudible]. All you want is to hear the truth from me saying that yeah. But you saying it's bigger than me though, so if it's bigger than me then --
>
> Mr. Hagee: I know it's bigger --
>
> Mr. Barfield: Right. So if it's bigger than me, let's get to the big shit so I can help myself. This ain't going to help me, incriminating myself and saying that I'm the man and she got the bundle from me. That's incriminating myself. You say the fish bigger than me. Get to the bigger fish so that way I can help myself. I can't help myself by incriminating myself.

Tr. 51:8-52:11.

The conversation turned briefly back to drug dealing and the source of Barfield's drugs before the agents brought up Quiera Walls, who Barfield indicated was his old girlfriend. The agents pressed Barfield on Walls's involvement with drug distribution, and Barfield denied she played any role, stating that Walls has children with no one else to look after them. See Tr. 54-55.

7

The interrogation then continued on as a circuitous discussion about Barfield's knowledge of the drug trade near the intersection of Douglas and Homan. As noted above, roughly two-hours, forty-one minutes into the interrogation Barfield told the agents that he no longer wished to speak with them, though the interview continued for another roughly three hours (one hour of which was recorded before a technical malfunction).

On August 15, 2018, the Grand Jury returned an indictment charging Defendant with: (1) conspiring to possess with intent to distribute and distribute a kilogram or more of heroin and 400 grams or more of fentanyl, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846 (Count One); (2) distributing heroin and fentanyl, in violation of Title 21, United States Code, Section 841(a)(1) (Counts Six and Seventeen); (3) using a cellular telephone in the commission of a felony violation of Title 21, United States Code, Section 846, in violation of Title 21, United States Code, Section 843(b) (Counts Eight and Thirteen); (4) being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1) (Count Twelve); and (5) laundering money, in violation of Title 21, United States Code, Section 1956(h) (Count Nineteen). Dkt. 149.

## II. DISCUSSION

Defendant argues that the Government coerced him into incriminating himself, making his statements to the agents involuntary and thus inadmissible. "An incriminating statement is voluntary if it is 'the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" United States v. Villalpando, 588 F.3d 1124, 1128 (7th Cir. 2009) (citing United States

v. Dillon, 150 F.3d 754, 757 (7th Cir. 1998)). False promises of leniency may render a statement involuntary, but "police tactics short of the false promise are usually permissible." Id.

Villalpando clarifies that the reason such "false promises" can render a confession inadmissible is that:

> a false promise has the unique potential to make a decision to speak irrational and the resulting confession unreliable. Police conduct that influences a rational person who is innocent to view a false confession as more beneficial than being honest is necessarily coercive, because of the way it realigns a suspect's incentives during interrogation. An empty prosecutorial promise could prevent a suspect from making a rational choice by distorting the alternatives among which the person under interrogation is being asked to choose. . . . The ultimate result of a coercive interrogation is unreliable.

Id. (internal quotations and citation omitted).

Although false promises of leniency are forbidden, "the law permits police to pressure and cajole, conceal material facts, and actively mislead" a subject. United States v. Rutledge, 900 F.2d 1127, 1131 (7th Cir. 1990). In other words, "[t]rickery, deceit, even impersonation do not render a confession inadmissible . . . unless government agents make threats or promises." United States v. Kontny, 238 F.3d 815, 817 (7th Cir. 2001). "The policeman is not a fiduciary of the suspect. The police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible." Rutledge, 900 F.2d at 1131. Only if circumstances "demonstrate that police coercion or overreaching overbore the accused's will and caused the confession" is an incriminating statement involuntary. Id. (citing Conner v. McBride, 375 F.3d 643, 651 (7th Cir. 2004)).

To determine whether police have overborne the accused's will in such a way, the Court considers the totality of the circumstances surrounding the accused's statements. Villalpando, 588 F.3d at 1128. In analyzing the totality of the circumstances, the Seventh Circuit has considered several specific circumstances, including the actual words used by the police when making a supposed promise, Montgomery, 555 F.3d at 630; whether the accused was given his Miranda warning, Villalpando, 588 F.3d at 112; the Defendant's age, id.; the nature and duration of the questioning, id.; and whether the Defendant was punished physically, id.

With respect to Defendant, the words actually uttered by the agents did not constitute false promises of leniency—either when considered by themselves or in the greater context of the interrogation. Defendant primarily points to one statement by Agent Hagee and argues that it constitutes the sort of fraudulent statement by an officer that would render any admissions involuntary: that "there may be a way out of this. Okay?" Tr. 35:12-13.

This language is not definite enough to constitute a promise, let alone a false promise of leniency. See Montgomery, 555 F.3d at 629-30. First, Agent Hagee couched the language by using the word "may." The word "may" by its nature is not the language of a guarantee or a promise, but rather suggests that a circumstance could potentially come about if certain conditions are met. The agent does not say, "If you tell me who your supplier is, you will not be prosecuted." That would likely cross the line. See United States v. Baldwin, 60 F.3d 363, 365 (7th Cir.1995) (generally, false promise of leniency made in order induce a confession is a forbidden tactic).

Rather, like the language that was approved of by the Seventh Circuit in Villalpando, the language used by Agent Hagee here does not rise to the level of the forbidden quid pro quo that otherwise might cause an unreliable confession (the danger discussed by the Seventh Circuit cited

10

above). In Villalpando, the officer told the accused that "we don't have to charge you" and indicated that she would sit down with the DEA, police, and the accused's probation officer to "work this out." Id. at 1129. Such promises, the Seventh Circuit held, were "less than solid." Id. "None of these, standing alone or in the context of the interview, represented a solid offer of leniency in return solely for his admission to cocaine possession." Id.

Similarly, any supposed promise here is "less than solid." In addition to the use of the word "may"—which indicates a potentiality—the agent was likewise ambiguous as to what was being offered as "a way out." A "way out" is not a legal term or a term of art. Certainly Defendant raises a reasonable argument that this could be interpreted to mean a complete avoidance of all legal and criminal culpability in the matter. And perhaps the agents were opening the door to a negotiation on such a topic, but it certainly was not definitively promised. A more reasonable interpretation of a "way out" is that Barfield could earn himself favor with the Government and enter some sort of cooperation agreement or earn a sentencing reduction down the line. Such an agreement would be a "way out" from being subjected to the full statutory penalties that Barfield was and is facing in this case for the alleged heroin and fentanyl distribution conspiracy. Thus, the language alone is not sufficiently clear to constitute a promise.

The fact that Defendant's will was not overborne by this alleged "false promise" is further evidenced by other circumstances surrounding his statements, including his clear acknowledgment on several occasions that what he was saying could be used against him in a subsequent prosecution (which Agent Hagee agreed with at one point). Tr. 42:14-20. Remarkably, Defendant actually recalled that in relation to a previous case, he had spoken with police only for his lawyer to later say to him "you shouldn't have fucking said this. Why you say this?" Tr. 47:13-14. These

statements by Barfield indicate that he was making what he believed was a rational decision to cooperate with the agents in an effort to secure some form of leniency from the Government and that he realized he may have been incriminating himself while attempting to pursue that end. The leniency he was looking for, however, was not the result of a false promise of non-prosecution or a false promise that his words would not be used against him, but rather based on the permissible promises of the agents to attempt to help him out if he cooperated and answered their questions. United States v. Charles, 476 F.3d 492, 497 (7th Cir. 2007) (a confession induced by a promise "to bring cooperation by the defendant to the attention of prosecutors [did] not render a confession involuntary.").

Moreover, other circumstances militate against a finding of coercion. The Defendant acknowledged his rights and has a familiarity with the criminal justice system. He was 36 years old at the time of the interrogation—a grown, mature man. He was not physically threatened in any way. Given the totality of the circumstances, Defendant's statements were voluntarily given and were not improperly induced by the type of false promise that has been held to be unlawful.

Defendant argues that in considering the totality of the circumstances, the Court must also consider that the agents "knew that Mr. Barfield had a romantic relationship with Ms. Walls and . . . exploited this fact by showing Mr. Barfield how much trouble Ms. Walls was in." Dkt. 238 at 13. This "exploit[ation]" caused Barfield "significant emotional anguish." Id. Even accepting that Barfield was suffering emotionally due to Ms. Walls's alleged involvement with the drug and money laundering conspiracy alleged, this anguish does not alter the fact that Barfield was not coerced into making an involuntary confession. The same facts that illustrate voluntariness discussed above are dispositive, regardless of whether the agents played off Barfield's romantic

relationship with one of his alleged co-conspirators. As noted above, Barfield repeatedly acknowledged that his statements could be used against him (which Agent Hagee affirmed mid-interrogation), the agents did not make a promise that he would not be prosecuted, and Barfield was not subjected to any sort of physical intimidation. The fact that part of the pressure applied by agents related to Barfield's old girlfriend does not alter the fact that it is clear from the other circumstances that his will was not overborne such that he was not able to make a rational decision when it came to speaking with the agents. Rutledge, 900 F.2d at 1131 ("The policeman is not a fiduciary of the suspect. The police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible.") The officers did not cross the line to the point of making rational decision impossible in this case.

### III. CONCLUSION

For the foregoing reasons, the motion to suppress is denied.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: October 15, 2019